**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

VANESSA MATHEWS and       )
RANDY MATHEWS,            )
                                )
       Plaintiffs,          )
                                )
v.                           )     Case No. 1:15-CV-247
                                )
REV RECREATION GROUP, INC.,   )
                                )
       Defendant.         )

## OPINION AND ORDER

This matter is before the Court for resolution of three pending motions. Defendant REV Recreation Group, Inc., filed a motion for summary judgment (ECF 29), to which Plaintiffs Vanessa and Randy Mathews filed a response in opposition (ECF 37) and REV replied (ECF 40). REV also filed a "Motion to Strike Expert Opinion of Tom Bailey" (ECF 28), to which the Mathews filed a response in opposition (ECF 36) and REV replied (ECF 39). The last motion is the Mathews' "Motion for Leave to Amend Plaintiffs' Brief in Opposition to Defendant's Motion for Summary Judgment Nunc Pro Tunc" (ECF 41), to which REV filed a response in opposition (ECF 42) and the Mathews replied (ECF 43). Because the undisputed material facts preclude the Mathews' claims, REV's motion for summary judgment (ECF 29) is GRANTED; REV's motion to strike expert opinion (ECF 28) is DENIED AS MOOT; and the Mathews' motion to amend their brief in opposition is DENIED AS MOOT.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

Summary judgment is not a substitute for a trial on the merits nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). If it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). "A genuine dispute as to any material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014) (citation and internal quotation marks omitted). In deciding whether a dispute exists, the Court must "construe

all facts and reasonable inferences in the light most favorable to the non-moving party." *Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 723 (7th Cir. 2015) (citation omitted). Under Rule 56, the movant has the initial burden of establishing that a trial is not necessary. *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). "That burden may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* (citation and internal quotation marks omitted). The nonmovant "must go beyond the pleadings (e.g., produce affidavits, depositions, answers to interrogatories, or admissions on file) to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in [its] favor." *Id.* (citation and internal quotation marks omitted). "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). "[S]peculation and conjecture" also cannot defeat a motion for summary judgment. *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013). In addition, not all factual disputes will preclude the entry of summary judgment, only those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted). Finally, "[t]he court must not weigh the evidence presented or determine credibility of witnesses; the Seventh Circuit instructs that 'we leave those tasks to factfinders.'" *Winston v. Sauvey*, 2016 WL 7480393, at *1 (E.D. Wis. Dec. 29, 2016) (quoting *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010)).

**DISCUSSION**

**I. Background.**

On October 30, 2017, the parties filed a joint motion to extend the briefing schedule for the motion for summary judgment and for permission to file briefs in excess of the page limitations contained in this Court's local rules. Joint Motion (ECF 35). The parties claimed that they needed more time and more pages "[t]o fully address all of the issues and laws involved in this complex and hotly disputed case" and the "complex factual and legal issues that this case raises." *Id*., p. 2. The Court has reviewed the parties' briefs (and all the evidence submitted with them) and agrees this case is "hotly disputed." The only part of the case that is "complex," however, is the facts, and even then the situation is more messy than it is complex.

The parties' claims and defenses are straightforward. The following paragraph from the Plaintiffs' complaint summarizes the basis for their lawsuit:

> This case involves a defective 2014 Holiday Rambler recreational vehicle that defendant designed, constructed, and warranted but which it was not able to repair within a reasonable number of chances or a reasonable amount of time and whose express and/or implied warranties defendant breached.

Amended Complaint (ECF 21), p. 3. The Mathews purchased the RV, which was manufactured and warranted by REV,[1] from Mellott Brothers Trailer Sales in Willow Street, Pennsylvania, on May 7, 2014. *Id*., p. 4. The Mathews claim that the new RV had problems or defects from the get-go and that "[w]ithin a few short hours, problems with this new RV began to occur, starting with defects in the room slide out and electrical system fuses inexplicably 'blowing' that caused

---

[1] REV explains in its memorandum that the 2014 RV was "manufactured by Navistar[]" and that "REV Recreation Group, Inc.[,] is the successor in interest to Navistar RV, LLC." Defendant's Memorandum, p. 1, n. 1.

4

lights not to work, among other things." *Id*. The Mathews took the RV to an RV mechanic for repair, and later to REV's factory on two occasions, but they allege that the problems were not fixed and even more appeared during the time they owned the vehicle. The Mathews state that the problems with the RV that arose within hours after they took delivery were a harbinger and that "[t]heir nightmare was just beginning." *Id*. They elaborate as follows:

> After acquiring the vehicle, the Mathews Family discovered that the RV did not conform to the representations of defendant inasmuch as it developed continuing malfunctions, defects and problems and that was unfair and/or deceptive and/or unconscionable to the Mathews Family. . . . Ever since purchasing the RV, the RV has been defective in spite of repeated repair attempts with no success. The warrantor's agent tried fixing the RV's many defects repeatedly, telling Plaintiffs each time that it was repaired afterwards. The Mathews Family would then realize later that it wasn't. In spite of the Mathews Family's numerous complaints and defendant's warranty-covered repair attempts, serious and substantial accident damage as well as slideout defects in the RV were never fixed at all and that was unfair and/or deceptive and/or unconscionable to the Mathews Family. The Mathews Family notified both the dealer and the defendant of this and many more defects in the RV and eventually asked the defendant to buy the RV back. It would not do so and that was unfair and/or deceptive and/or unconscionable to the Mathews Family.

*Id*., pp. 6-7. Based on those allegations, the Mathews are pursuing the following claims against REV:

1) "[B]reach of express and/or implied warranties by the defendant in Pennsylvania and/or Virginia and/or Indiana." *Id*., p. 3.[2]

---

[2] The Mathews apparently decided that Indiana law applies to their breach of warranty claims, since that is what they discuss in their brief. *See* Plaintiffs' Response, p. 20 (discussing elements of breach of warranty claim under Indiana law); p. 17 (discussing measure of damages for breach of warranty under Indiana law); p. 22 (discussing implied warranty of merchantability under Indiana law). They are less forthcoming about their claim for violation of some unspecified state law consumer protection statute. As to that claim, the Mathews curiously argue that based on the facts of this case, "reasonable minds could conclude that [REV] violated the Virginia Consumer Protection Act . . ." and/or "the Pennsylvania Unfair Trade Practices and Consumer Protection Law" (*id.*, p. 40). The Mathews do not mention in their brief, let alone discuss, any

2) "[V]iolation of the Magnuson-Moss Warranty Act, 15 U.S.C. 2301, et seq." *Id.*, p. 14; and

3) "[V]iolation of applicable state Udap laws, being the Pennsylvania Unfair Trade Practices and Consumer Protection Law, and/or the Virginia Consumer Protection Act, and/or the Indiana Deceptive Consumer Sales Act[.]" *Id.*, p. 14.[3] The Plaintiffs seek compensatory damages "[o]r, in the alternative . . . equitable relief including rescission[.]" *Id.*, p. 17.

REV cheerfully acknowledges that when the Mathews purchased the RV they "were provided a One Year Limited Warranty." Defendant's Memorandum, p. 2. This Limited Warranty, like all such warranties, imposed duties on both the seller/manufacturer and the purchasers. REV was bound to repair any faulty or defective "components, assemblies and

_____

claim under any Indiana consumer protection statute or deceptive trade statute. In any event, as this Court explained in *Swan Lake Holdings, LLC v. Yamaha Golf Cart Co.*, 2010 WL 3894576, at *3 (N.D. Ind. Sept. 27, 2010): "Where, as here, the parties do not identify a conflict between the bodies of state law that might apply to their dispute, courts apply the law of the forum state–here, Indiana. *See Gonzalez v. Volvo of Am. Corp.*, 752 F.2d 295, 299 (7th Cir. 1985) ('Where parties fail to raise a possible conflict of law, the better rule . . . is that the substantive law of the forum controls.'); *see also Gould v. Artisoft, Inc.*, 1 F.3d 544, 549 n. 7 (7th Cir. 1993) (same); *National Ass'n of Sporting Goods Wholesalers, Inc. v. F.T.L. Marketing Corp.*, 779 F.2d 1281, 1284-85 (7th Cir. 1985) (same)." In this instance, REV *does* raise this issue, arguing that while the Mathews make reference to the laws of three states, they must choose the one under which they seek to recover. Defendant's Reply, p. 19 (citing *Popham v. Keystone RV Co.*, 2016 WL 4993393 (N.D. Ind. Sept. 19, 2016)). The Mathews ignore this confusion and argue in their brief that REV committed some unspecified deceptive act in violation of the statutes of either Virginia or Pennsylvania (Plaintiffs' Response, pp. 38-45) and/or that they are entitled to the remedy of rescission under Indiana law (*id.*, p. 45). In keeping with *Swan Lake*, the Court will apply Indiana law in this case. In the end, however, as explained later in this order, this is a non-issue because the Court concludes that the Mathews cannot proceed with either their breach of warranty claims or their deceptive practices claim regardless of which state's law is applied.

[3] The Mathews explain that "'Udap' stands for Unfair and Deceptive Acts and Practices and refers to the Uniform Consumer Sales Practices Act which is itself a uniform law adopted in all 50 states and found at 7 ULA 1 (1970). Each state's version of the model Udap law may vary slightly from other states." Amended Complaint, p. 14, n. 3. This lesson in the law is unnecessary given the Court's conclusion that Indiana law applies in this case to any state law claims the Mathews are asserting.

systems" of the RV "for twelve months from the original retail purchase." *Id*., p. 3 (citing Exh. D (ECF 30-4), Limited Warranty).[4] In order to take advantage of the Limited Warranty, the Mathews were required by its express terms to: "notify Warrantor or one of its authorized servicing dealers of the defect within the warranty coverage period and within five (5) days of discovering the defect; and . . . deliver your [RV] to Warrantor or Warrantor's authorized servicing dealer at your cost and expense." *Id*. The Limited Warranty further provides that "[i]f the repair or replacement remedy fails to successfully cure a defect after Warrantor received a reasonable opportunity to cure the defect(s), your sole and exclusive remedy shall be limited to Warrantor paying you the cost of having an independent third party perform repair(s) to the defect(s)." *Id*. This clause, explains REV, sets forth the "two remedies should a service item occur: (1) as a repair remedy, REV will repair the issue (under the terms of the warranty) . . . ; and (2) if the Repair Remedy fails, REV will pay the Mathews' actual costs to have an independent third party (of the Mathews' choosing) perform the repairs (the 'Back-Up Remedy')." *Id*., pp. 4-5.

REV argues that it is entitled to summary judgment on all of the Mathews' claims for the following reasons:

> Each count is premised upon the same allegation: REV failed to live up to its express and/or implied warranties. The evidence demonstrates, however, that REV fully performed under its Limited Warranty. The Mathews presented their RV for repair on only two occasions during the 1 year period of the warranty. The Mathews also opted to deal with certain purported issues on their own and outside of the express terms of the Limited Warranty. Because the Mathews did not

---

[4] The relevant language from REV's Limited Warranty is excerpted in REV's memorandum (*see* pages 3-4, 12-13, 15-16) and the Mathews' response brief (*see* Exh. 1, 37-4). It need not be repeated here, especially since the parties do not dispute its existence, contents or wording, but rather whether it was breached.

adequately or timely avail themselves to the Repair Remedy and Back-up Remedy of the Limited Warranty, Summary Judgment is appropriate on all counts.

*Id.*, pp. 1-2.

To summarize, the Mathews assert that they purchased a "lemon" and allege that REV is liable to them because it failed to honor its warranties; and REV contends it did all it could to remedy problems and that the Mathews voided or nullified warranty coverage by failing to notify REV of problems in a proper or timely manner and by having the RV repaired by unauthorized mechanics.

**II. The undisputed material facts establish that REV did not breach any express or implied warranties.**

With the stage set, the Court will unravel what it referred to above as the "messy" facts. Once the layers of the onion are peeled away the undisputed material facts become clear–and they bar the Mathews' claims.

Again, the heart of REV's argument in support of its motion is its contention that it did not breach any warranty, express or implied, and that the undisputed facts show the opposite–that REV addressed every problem or issue the Mathews presented to them *and* that the Mathews did not give REV notice of, or opportunity to cure, other alleged problems. REV begins by stating that "[i]mmediately following the purchase of the RV, the Mathews . . . allege they experienced . . . issues, which they reported to the selling dealership, via telephone. . . . But the RV was not brought into the dealership for repairs." Defendant's Memorandum, p. 5 (citing Exh. A (ECF 30-1), Deposition of R. Mathews). REV states that "[a]s the weekend continued, the Mathews also noted that the shower leaked . . . and the bedroom TV did not work. The Mathews did not report those issues to the selling dealership. . . . Mr. Mathews did not call anyone and did not report the

issues to anyone else, including, most notably, REV." *Id*. REV further claims that "[i]n June 2014, the Mathews . . . allege they experienced [more] issues[,]" that Mr. Mathews called Mellott Brothers to report these additional problems, and "was given the number for REV so he could find a closer authorized repair center." *Id*. According to REV, "contrary to the terms in the Limited Warranty, in July 2014 Mr. Mathews decided to take the RV to Johnson's RV to perform repairs. Johnson's RV is not authorized by REV to perform warranty service, but Mr. Mathews had used Johnson's RV to service his previous RV. . . . Mr. Mathews did not notify REV that the RV was at Johnson's. . . [and] no one from Johnson's RV ever presented repair estimates or invoices to REV." *Id*., p. 6. According to REV, the Mathews also took the RV to Johnson's in October of 2014 "to have a new slide cable installed." *Id*. REV claims that the Mathews did deliver the RV to the company "for repairs beginning December 15, 2014[,]" that the vehicle "was at the REV factory from December 15, 2014 to December 19, 2014[,]" during which time "[e]ach of the [issues reported] . . . were remedied[.]" *Id*. (citing Exh. C (ECF 30-3), Affidavit of A. Brooks; Exh. A, Deposition of R. Mathews). A few weeks later, "[a]s a gesture of goodwill, REV issued an additional warranty ('extended warranty'), administered under the terms of the original Limited Warranty. The Extended Warranty was valid until November 7, 2015." *Id*., p. 8 (citing Exh. H (ECF 30-8), Letter from J. Hurd to R. Mathews). REV contends that "[o]n March 3, 2015, after experiencing an issue with the cable for the main slide, Mr. Mathews contacted REV" and "[t]his was the first time REV was presented with an issue related to the main slide cable." *Id*. The vehicle was delivered to REV for repairs and the Mathews "reported only three issues: [1] The A/C 'couldn't keep up'; [2] Curbside slide had a broken cable; [3] Sealing tape on the slides had failed." *Id*. REV claims that it "assessed the three issues,

determining that the A/C was functioning appropriately and remedying the other [two] issues." *Id*. According to REV, "[t]he Mathews did not again present the RV to REV or any REV authorized repair representatives for any additional issues[]" and "have never presented REV with any costs, estimates, or invoices under the Back-Up Remedy of the Limited Warranty." *Id*. Based on these factual assertions, REV argues that it honored the terms of its warranty but the Mathews did not, thereby foreclosing this lawsuit and entitling REV to summary judgment.

The Mathews don't actually dispute the material facts so much as hide them within their broader narrative, which is that the Holiday Rambler was a deeply flawed piece of machinery that REV did not repair to the Mathews' satisfaction after repeated opportunities to do so and therefore a jury could conclude that REV breached its warranties. But while the facts and evidence support the Mathews' contention that the RV had numerous problems, they do not support the allegations that REV failed to honor its warranty obligations. The Mathews' frustration is understandable (and palpable in their briefs), but the undisputed facts–virtually all of which come directly from the testimony of Plaintiff Randy Mathews–reveal that they do not have a valid cause of action against REV. In this instance, no conflicting evidence needs to be weighed and no credibility determinations need to be made, and REV is entitled to judgment as a matter of law for the reasons discussed below.

It is well established, as this Court has noted, that "to prevail on a breach of warranty claim under Indiana law, the plaintiff must show (1) the existence of a warranty; (2) breach of that warranty; and (3) that the breach was the proximate cause of the loss sustained." *Swan Lake Holdings, LLC*, 2010 WL 3894576, at *3 (citing *Irmscher Suppliers, Inc. v. Schuler*, 909 N.E.2d 1040, 1048 (Ind.Ct.App. 2009); *Frantz v. Cantrell*, 711 N.E.2d 856, 860 (Ind.Ct.App. 1999);

*Peltz Const. Co. v. Dunham*, 436 N.E.2d 892, 894 (Ind.Ct.App. 1982)). "The standard to be applied in determining whether or not there has been a breach of warranty is one of reasonableness in light of surrounding circumstances." *Id.* (quoting *Barnes v. Mac Brown and Co., Inc.*, 342 N.E.2d 619, 621 (Ind. 1976)). The same is true with an implied warranty of merchantability. "Indiana recognizes implied warranties of fitness for a particular purpose and implied warranties of merchantability." *Hyundai Motor Am., Inc. v. Goodin*, 822 N.E.2d 947, 951-52 (Ind. 2005) (citing Ind. Code §§ 26-1-2-314, 315 (2003)). The "implied warranty of merchantability is imposed by operation of law for the protection of the buyer and must be liberally construed in favor of the buyer." *Frantz v. Cantrell*, 711 N.E.2d at 859. "An action based on breach of warranty requires evidence showing not only the existence of the warranty but also that the warranty was broken and that the breach was the proximate cause of the loss." *Id*. at 860.

REV argues that "the Mathews cannot establish a breach of the express warranty because REV addressed and repaired all issues which it was presented with during the one-year warranty period." Defendant's Memorandum, p. 11. REV states that "[a]s express warranties are 'contractual in nature, the language of the warranty itself is what controls and dictates the obligations and rights of the various parties.'" *Id*. (quoting *Medline Indus. v. Ram Med., Inc.*, 892 F.Supp.2d 957, 968 (N.D.Ill. 2012)). REV also states that "[a] warrantor is not obligated to perform repairs which are presented to it outside the terms of an express limited warranty." *Id*., p. 13 (citing *Popham v. Keystone RV Co.*, 2016 LEXIS 127093, *13 (N.D.Ind. Sept. 19, 2016) ("When breach of an express warranty occurs is a straightforward analysis: it must occur if it is to occur at all, before the express warranty ends.")). REV argues that "[b]ecause the issues the

11

Mathews currently complain about were not presented to REV in accordance with the Limited Warranty (i.e. five days after discovery and to an authorized dealer) and not within the 1 year period of the Limited Warranty, summary judgment is appropriate." *Id*., p. 14.

The undisputed material facts in this case, the determinative ones, are tucked within Randy Mathews' own sworn testimony, and come into focus after a detailed (and somewhat lengthy) examination of that testimony, as well as other evidence submitted by both sides. To begin, Mr. Mathews testified that the first problems he and his wife encountered after taking delivery of the RV included the blowing fuses, the refrigerator not working, and the leveling system working only intermittently. R. Mathews Depo., (ECF 30-1), pp. 45-46. Mr. Mathews called John Hurd at Mellott Brothers, who told him to replace the fuses "and see what happened." *Id*., p. 47. Mr. Mathews did so, but it the problem persisted. *Id*. Mr. Mathews called Mr. Hurd again, "but as we got into the weekend they weren't available." *Id*., p. 47. Mr. Mathews recalled making only one attempt to contact Mr. Hurd and did not testify to making any follow-up calls concerning this issue. *Id*., pp. 47-48. It was during that same weekend trip–the one to Hershey, Pennsylvania, that the Mathews took immediately after taking delivery of the RV–that they noticed more problems, including a leaking shower door, condensation forming on the refrigerator, and a television and DVD player that did not work. *Id*., p. 48. However, when asked whether he informed Mellott about these issues Mr. Mathews conceded that "I did not." *Id*. The Mathews did not use the RV again until June 20, 2014, when they set out on their second trip in the vehicle. *Id*. Mr. Mathews testified as follows:

> Q.: Between that trip to Hershey and [the June 20 trip], did you take your unit anywhere to be serviced for those issues that you had spotted on your first trip?

A.: I did not. I did not yet.

Q.: Did you call anybody, once you got home, about those issues?

A.: No.

*Id*., pp. 48-49. During their second trip, the Mathews contend that fuses were still blowing, the leveling jack still operated only intermittently, and the curbside slide cable broke. *Id*., p. 49. The next contact that the Mathews had with REV was on June 23, 2014, when he called John Hurd at Mellott Brothers, who in turn told him to call Tina. *Id*., p. 50-51. This is the conversation that began the chain of events that culminated in the Mathews taking the RV to Johnson's. Here is the play-by-play from Mr. Mathews' deposition:

Q.: What did you and Tina discuss?

A.: Tina was kind enough to go through her list. She put me on hold for a minute and went through her list and found me what she called a factory [authorized] dealer in Gloucester, Virginia. She gave me the phone number, and I called that dealer.

Q.: Did you report to Tina any of the problems that you were experiencing with the RV?

A.: As a recap, yes.

Q.: And at that point, June 23rd, 2014, did you understand that [REV] would work through factory-authorized dealers to take care of warranty issues?

A.: I understood that they may have a preference of dealers that they may want me to take it to, so I was agreeable to use their recommendation.

*Id*., pp. 51-52. Of course, the dealer Tina recommended turned out not to be factory authorized so Mr. Mathews called Tina again for assistance:

Q.: Did you call Tina back?

A.: I'm pretty sure I did[.] I think I called her back and we discussed having a

dealer close by me service the unit. And I understood the circumstance to be that they would have to approve the repair.

. . .

Q.: . . . How did you come to Johnson's R.V.?

A.: I had used Johnson's previously . . . ."

Q.: And you dropped your unit off on July 11th?

A.: That's right.

. . .

Q.: . . . And after you called Rick Johnson to make this July 11 appointment, did you notify [REV] of that fact?

A.: Did I? No.

Q.: Okay. And when you dropped it off on July 11th, what did you ask Rick Johnson to do?

A.: To focus on the soundbar, the television, the broken cable mainly because the thing is inoperable with a broken cable, and see if he could figure out why the converter was blowing fuses.

*Id.*, pp. 51-54. The RV remained at Johnson's from July 11, 2014, until late August. *Id.* When

Mr. Mathews picked the vehicle up he was told by Rick Johnson that "he had repaired the slide

cable, that the sound bar was not repairable and that the factory was going to send him a

replacement, and that the bedroom TV problem was yet to be resolved. He thought it was the

remote, and that he couldn't find a fault with the converter at the time. *Id.*, p. 56. Mr. Mathews

further testified as follows:

Q.: And did Rick Johnson tell you he had been in touch with the factory about these repairs?

A.: I was under the impression that he had been in touch with the factory.

. . .

14

Q.: Did you pay them[?]

A.: I didn't pay them anything on this.
. . . .

Q.: So did you call Tina or anyone else with the factory from that time, June 23rd of 2014 through August 27 of 2014?

A.: Not that I recall.

*Id*., pp. 57, 60.

The two repair visits to Johnson's are a subplot in themselves, and a significant one–not so much for the reasons the parties discuss, but (again) for the undisputed material facts that are revealed when the devilish details are unraveled.

It is undisputed that the Mathews were told about the one-year Limited Warranty at the time they purchased the RV. It is also undisputed that the Mathews knew that under the terms of that warranty, any mechanic to whom they took the unit for servicing would have to obtain prior approval before performing warranty repairs to the vehicle (having been told that specifically by Tina). Mr. Mathews believed he could have the RV serviced at Johnson's because the dealer Tina told him to contact turned out *not* to be an authorized servicer. But he concedes that his decision to take the vehicle to Johnson's was unilateral and based on the fact that he had done business with Johnson's in the past.

The significance of the two repair visits to Johnson's, according to the Mathews, is that they both involved a broken curb side slide-out cable, and therefore constitute two repair attempts under the Limited Warranty. Plaintiffs' Response, p. 10. Making a leap of logic then, the Mathews contend that when they agreed in May of 2015 to allow REV to perform repairs to the unit in its factory–including repairing a broken slide cable again–it was the *third* time that

REV repaired the same problem. *Id.*, p. 13 ("The RV was at [REV's] factory repair facility a second time from May 1, 2015 until June 25, 2015 for repair of . . . [the] curb side slide out cable . . . [third time]."). In other words, the first two repairs completed at Johnson's should be imputed to REV because Mr. Mathews *mistakenly* believed that Johnson's was authorized to perform warranty repairs and *mistakenly* believed that Ricky Johnson had contacted the factory to obtain that authorization. The Mathews then argue that the warranty in this case was breached because REV had *three* opportunities to repair the problem with the cable but it "failed to repair the RV's defects within a reasonable amount of time *and within a reasonable number of repair attempts*." *Id.*, p. 22 (italics added); *see also, id.*, p. 36 ("[REV] had a reasonable opportunity to repair all alleged defects. . . . [REV] had several chances . . . to repair the RV's many defects within the first year.").

The parties devote a lot of space to debating the issue, but in the end it doesn't matter whether Johnson's was authorized to perform work on the RV. The material undisputed facts to be gleaned from the parties' debate about this are that Mr. Mathews informed REV on June 23, 2014, during his phone conversation with Tina, that the RV had mechanical problems. Tina told him to contact an RV dealer near him that turned out not to be an authorized servicer. Mr. Mathews called Tina again and she told him he could take the RV to a servicer near him but that the servicer would have to obtain approval before performing repairs. The Mathews took the RV to Johnson's for repair, the work was performed, and the Mathews were told that the work was "covered" under their warranty. In truth, and adding a quirky twist, Johnson's never obtained approval for its work on the RV nor did it get paid for that work, but not because REV refused to honor its warranty. Instead, Johnson's never submitted the necessary paperwork. The work was

completed on August 18, 2014, but Johnson's never obtained approval, never received payment for the work, and the Mathews were never charged for that work.

Ricky Johnson, the owner of Johnson's RV, was deposed and testified as follows:

Q.: Tell us what happened there.

A.: Well, Mr. Mathews brought it in. We noticed that the rearward cable was snapped on the slide-out. He also had some other issues with the sound bar and the bedroom TV.

Q.: And what did you do?

A.: First called [the factory] about doing the warranty work on there. They said they needed an estimate for repairs. That's when I got them together.

We were very extremely [sic] busy at that time, and I neglected to follow up on turning this in because we were so busy. Mr. Mathews needed his RV back, so I repaired the RV *before I actually got authorization on the unit*.

Q.: Okay. Did you ultimately get authorization to do the work that you actually did?

A.: No, I did not.

Q.: Okay. What happened? Why not?

A.: An oversight on my part because we were so busy, and *I just neglected to follow back up on it*.

Defendant's Exh. F, Deposition of Ricky Johnson (ECF 30-6), pp. 2-3 (italics added). Mr. Johnson testified that he did not seek or receive any payment from the Mathews for the August repair and never sought reimbursement from REV:

Q.: Okay. So, you've never been paid for that?

A.: No.

Q.: I assume that you just never bothered chasing anybody to get paid because you were so busy with other things that you just went on?

A.: Correct.

*Id*., p. 3. When the vehicle was returned to Johnson's on October 31, for a second repair of the slide-out cable, Johnson's did not seek or receive payment from the Mathews, although Mr. Mathews did pay about $45 to purchase the cable itself from another RV dealer so that Johnson's could install it. Mr. Johnson testified as follows:

Q.: Tell us about that [second visit].

A.: I was not here on that day that Mr. Mathews came by. My lead technician took care of his problem for him. I had to call another dealership to get a cable for Mr. Mathews because he was heading out of town. My tech replaced that same cable.

Q.: Do you know how the cable got from where it was to your place?

A.: Yes. Mr. Mathews went and picked it up from the dealership himself and paid for the cable.
. . .

Q.: Now, is this the same cable and in the same slide-out room?

A.: Yes.

Q.: All right. After that was over, did [Mr. Mathews] ever come back?

A.: No, sir.

*Id*.

Between June 23, 2014, when he spoke with Tina, and October 17 when he contacted Johnson's a second time, Mr. Mathews did "nothing" about the inoperable sound bar or inoperable television because he was waiting for Johnson's to receive and install factory replacements that were "never received[.]" *Id*., pp. 60-61. When he spoke with Johnson's on October 17, it was because "the curb side slide out cable broke again" as the Mathews were preparing for their upcoming Halloween excursion. Aff. of R. Mathews (ECF 37-1), p. 4, ¶ 9.

Mr. Mathews made an appointment at Johnson's to get the cable repaired a second time. *Id.*, ¶ 10. It is undisputed that the Mathews did not inform REV about this second visit to Johnson's (because they were under the mistaken belief that Johnson's was authorized to perform repairs). This was done on October 31 and the Mathews continued on their Halloween trip. Depo. of R. Mathews, pp. 61-63.[5] It was during this trip that the Mathews experienced more problems with the RV, including "CO alarm was going off[,]" and "just regular stuff that was happening in this RV. The refrigerator latch letting go. The closet door in the bedroom started falling apart. The subwoofer came unscrewed from its brackets." *Id.*, pp. 63-64. Yet again, however, when asked if he "call[ed] anybody after Halloween 2014 regarding the issues you experienced with the RV?" Mr. Mathews responded "No." *Id.*, p. 64. The undisputed facts show that the Mathews had no contact with REV until some unspecified date "[a]fter this second trip" when Mr. Mathews "spoke with Angela and the scheduler Rick Black to arrange for repair of the RV at the factory." Aff. of R. Mathews, p. 4, ¶ 11. An appointment was scheduled and Mr. Mathews drove 19 hours to deliver the RV for repairs on December 15, 2014. Depo. of R. Mathews, p. 67. When he scheduled the appointment, Mr. Mathews explained to Angela and Rick the issues and problems that existed with the RV, including the issues first reported to Mellott Brothers and those that arose after the second trip (which the Mathews did *not* report to Mellott Brothers or REV). *Id.*, pp. 67-68. It is undisputed (because Mr. Mathews concedes the point) that the issue of the curb side slide out cable, which had been repaired by Johnson's twice, was *not* presented to REV as an

---

[5] During this second visit to Johnson's for a second repair of the curb side slide cable, the Mathews had to pay $44.52 to purchase a replacement cable from a dealer named Dodd RV and take it to Johnson's, who installed it free of charge. Depo. of R. Mathews, p. 61.

issue at this juncture. *Id*., p. 68.[6] The factory made a long list of repairs, all covered by the warranty, including the issues with the converter blowing fuses, the $CO_2$ alarm going off, the refrigerator leaking, and the bedroom television. *Id*., pp. 68-71. The only matter that was not resolved, according to Mr. Mathews, was the issue of the DVD player, about which he testified as follows:

> Q.: . . . What did the factory tell you about the DVD player during this December 2014 visit?
>
> A.: It had been discontinued.
>
> Q.: And what was the game plan when you left?
>
> A.: John Hurd–I had a conversation with him at some point where he agreed to just provide me the budget that they would normally pay for that unit and I'd go buy something to replace it. It never happened.
>
> Q.: And at the time you returned to Virginia on or about December 19, 2014, were you satisfied with the repairs that had been completed at that point?
>
> A.: I was hopeful that they would be successful, yes.

*Id*., pp. 70-71.

The Mathews had no conversations with anyone at REV following the December repair visit until early March of 2015:

_____

[6] Mr. Mathews testified as follows:

Q.: [W]hen you brought the [RV] to the factory, cable on the curbside slide was not broken, correct?

A.: I think that's correct. Yeah. The–it had broken twice previously. The third time it broke was March 3[, 2015], so that was after it returned from the factory the first time.

Depo. of R. Mathews, p. 68.

Q.: Did you have any communications, that you can recall, with [REV] between December 19th of 2014 and . . . March 3, 2015[?]

A.: Off the top of my head, I do not recall any other conversations. At that point I was pretty hopeful that we had been in communication enough to get the problem solved[.]

*Id*., p. 72.

Mr. Mathews apparently was mistaken when he testified that he had no conversations with anyone at REV between December 19, 2014, and March 9, 2015, as one of the Mathews' exhibits shows. John Hurd wrote a letter to the Mathews, dated December 29, 2014, which stated as follows:

It was a pleasure speaking with you earlier today.

As we discussed, as a good will gesture and in consideration of any downtime and inconvenience, [REV] agrees to make necessary good will repairs to your Presidential until November 7, 2015. This coverage period will be administered under the guidelines of our published limited warranty. Any and all repairs must be approved in advance by an [REV] representative which may or may not require an inspection and must be a result of defective workmanship or materials in manufacturing. Issues or concerns related to or as a result of normal use, aging and wear, regular maintenance and upkeep, or intended design or functionality are specifically excluded. This goodwill period is not an extension of the limited or any other warranties, and is made to you exclusively; it is not transferable to a subsequent owner.

Plaintiffs' Exh. 7 (ECF 37-7). This letter is significant and material for three reasons: first, it evidences REV's attempts to make repairs to the Mathews' RV pursuant to the Limited Warranty; second, it establishes as undisputed the fact that REV expressly agreed to make repairs to the RV, in keeping with its Limited Warranty, for a longer period of time; and third, it supports REV's contention that the Mathews were aware of the Limited Warranty and that the RV was subject to it even though they did not receive a physical copy of it until months later.

Returning to the events in March of 2015, the next communication between the Mathews and REV was on March 9. Mr. Mathews testified that on March 3, 2015, the curbside slide cable broke again while he "was prepping the thing, getting ready to camp." *Id*., p. 73. On March 9, Mr. Mathews called REV and spoke with Jesse, John Hurd and Angela. *Id*., p. 74. He testified as follows:

Q.: . . . Do you recall that conversation?

A.: Yeah, mainly because of the guy that answered the phone, whose name was Jesse, I had had enough problems with it by then that I just felt like it was unrepairable, which is what I said to Jesse, and he told me he thought that was a cop-out, in kind of a snide manner.

Q.: Did you ask him what he meant by cop-out?

A.: He said its mechanical. Anything mechanical can be repaired. . . .

Q.: Okay. And what did you and Angela discuss on March 9 of 2015?

A.: Just all the whole list of problems that we'd had and the problems that continued unresolved.

Q.: [W]hat problems, in your mind, remained unresolved at the time when you talked to Angela Brooks on March 9, 2015?

A.: I think the main issue at this point was still the cable breaking, because you're stranded once that happens. And in your 60s it's not so easy to push a 14-foot slide in manually.
. . .

Q.: So the main issue when you called Angela on March 9, 2015, was the slide?

A.: I pretty much was convinced at that point that the slide was not going to be able to be repaired.

Q.: What did Angela tell you on March 9, 2015?

A.: Their response has consistently been they're going to fix it, they're going to repair it. Of course, at this point I'm concerned about running out of warranty

22

time. I'm concerned about the series of events that–all the failures that had happened with this thing just indicated to me a completely poor level of workmanship and quality control.

Q.: And did you express that to Angela on March 9, 2015?

A.: I think I did.

Q.: Did you guys resolve anything during that discussion?

A.: No, because I was very unhappy with the unit, and Angela and John were both of the mind that they wanted to keep trying to fix it and trying to fix it and trying to fix it.

*Id.*, pp. 76-78.

The unhappiness Mr. Mathews testified to led him to send his letter, dated March 12, 2015, to Angela Brooks, in which he sought a full refund for the RV. Plaintiffs' Exh. 9 (ECF 37-9). In that letter, Mr. Mathews wrote that "I believe my 2014 Holiday Rambler Presidential . . . is a lemon as defined in the Manguson-Moss [sic] Federal law, as well as Virginia's Lemon Law. I am hereby making a demand for relief under these laws. *Id.*, p. 1. The letter goes on to recite the many problems the Mathews allege to have had with the RV to that point (including problems that had already been repaired by REV during the December 2014 factory service). *Id.*, pp. 1-2. The letter then states as follows:

Please consider this your 10 day notice that if we are unable to reach agreement on an acceptable solution, I will be forced to proceed with any and all legal remedies available to me.

My preference is that you reimburse me for all expenses incurred as a result of this transaction and take your unit back. My faith in Holiday Rambler is severely damaged. I don't think a swap for another Holiday Rambler will be acceptable. My sincere hope is that you will respond quickly and work this out fairly, without the need for lawyers. If I have to resort to acquire legal representation, the law states that you will be responsible for their fees. Let's both stop the bleeding, and put this one behind us!

*Id.*, p. 2. The Mathews acknowledge that while REV "refused to take the RV back and give the Mathews their money back, [REV] promised to repair the continuing problems with the RV under warranty, agreed to extend the warranty by yet another year, and agreed to pay for expenses relating to transportation to and from their factory repair facility for repairs to the RV." Plaintiffs' Response, p. 13. Indeed, the Mathews submitted a copy of an email they received from Angela Brooks, dated March 29, 2015, that stated as follows: "In response to your 3/20/15 letter,[7] I want to stress that we do want the opportunity to repair the slide and we want to ensure that the repair is a complete fix. . . . I understand that you are concerned about future performance, but at this time we are not willing to make stipulations based on what might happen in the future." Plaintiffs' Exh. 10 (ECF 37-10), p. 1. Also in that email, Ms. Brooks offered to "pay a transport company to transport the [RV] to Decatur, Indiana[,] for the repair appointment[,] [r]eimburse you for fuel and hotel expenses from your December 2014 appointment at Decatur[,] [p]rovide a one year goodwill policy on the [RV] (to be administered by the guidelines of the . . . limited warranty)[,] [r]eimburse or provide a one-way airline ticket for your wife, so she can join you to pick up the [RV] after repairs[,] [r]eimburse your round trip fuel expenses to pick up the [RV]

---

[7] It is not clear whether Ms. Brooks' reference to a letter from Mr. Mathews on "3/20/15" actually refers to his letter dated March 12. There is nothing in the record indicating that Mr. Mathews sent a letter or other communication to REV on March 20, so her reference to that date could be a scrivener's error or perhaps a reference to the date she received Mr. Mathews' March 12 letter. It doesn't matter, though, since what is relevant and material is that the March communications between the Mathews and REV render the following facts undisputed: after Mr. Mathews sent his letter demanding a refund, he had discussions with REV and agreed to give them a second opportunity to make repairs to his RV, all covered under the Limited Warranty, beginning on May 1, 2015. *See also*, Aff. of A. Brooks, Defendant's Exh. 3 (ECF 30-3), p. 2, ¶¶ 6 and 7 (". . . I am aware of only two repair attempts being presented to REV. One taking place in December 2014 and the final taking place in May 2015. Following the May 2015 repair visit REV was not again presented with any defects or given the opportunity to repair the RV.").

after repairs[, and] [p]erform [an inspection] at the Decatur service center to check system functions." *Id*. By way of a letter dated April 13, 2015, Angela Brooks extended "the following offer to repair your [RV]." *Id*., p. 2. That letter confirmed that Mr. Mathews and REV agreed that the RV would be delivered to the factory in Decatur, at REV's expense, on May 5, 2015, to address the complaints the Mathews had (including, specifically, their complaints about the slide out cable). *Id*. The letter also confirmed the details of REV's offer to reimburse the Mathews for expenses related to this service (such as fuel expenses and hotel expenses) and its offer to "provide a one year, non-transferrable, goodwill coverage policy, to be administered under the same guidelines as the . . . limited warranty. This one year coverage period will begin on the last day of the repair appointment." *Id*.

So, off goes the RV to REV's Decatur, Indiana, factory for only the second time since the Mathews bought it. By the Mathews' own admission, "[t]he RV was at the Defendant's factory repair facility a second time from May 1, 2015 until June 25, 2015 for repair of the . . . curb side slide out cable . . . A/C not keeping up[,] entry door buckled . . . [and] slide out seals failing." Plaintiffs' Response, pp. 13-14 (citing Plaintiffs' Exh. 11 (ECF 37-11), REV Repair Orders). The Mathews also concede that REV "repaired the damage to the RV caused by their driver's accident." *Id*. (citing Aff. of R. Mathews).

On or about June 25, 2015, the RV was returned to the Mathews. However, Mr. Mathews testified that "the RV hasn't been used since." Depo. of R. Mathews, p. 88. The Mathews allege that after the RV was returned they experienced even more problems (even though the vehicle had not been used). The Mathews claim that "[o]n July 1, 2015, the bedroom slide out cable broke after [REV] had inspected the RV. . . . The Mathews have not been able to use the RV

since that date. . . . On July 18, 2016 he noticed that the kitchen cabinets were pulling apart. . . . and noticed that the back of the RV was leaning downward and not level." Plaintiffs' Response, p. 14 (citing Aff. of R. Mathews). The Mathews allege as follows: "The current problems with the RV that remain unrepaired at minimum are: the bedroom slide out cable is broken, the DVD player does not work (two repair attempts), the bedroom TV does not work (2 repair attempts), the A/C is not keeping up (1 repair attempt), the rear of the coach is falling downward and not level, the kitchen island cabinets are falling apart, and the water tank is falling out of the bottom of the RV." *Id*. But (and this is, as the saying goes, a really big "but"), the Mathews concede that after the RV was returned to them on June 25, 2015, they *never reported any problems to REV or sought any additional repairs*, nor did they attempt to have any problems corrected by any other dealer or mechanic. On this point, as with many others, Mr. Mathews' own sworn testimony establishes this undisputed fact:

Q.: Then your next note indicates by July 1, 2015 the bedroom slide able had broken; is that correct?

A.: That's correct.

Q.: Now, that slide had never been addressed by the factory, correct?

A.: My observation was that that slide had never been trouble until the factory fixed it.

Q.: But you're not aware of whether or not or to the extent to which [sic] the factory did anything to that slide during–

A.: That's true. That's correct.

Q.: Since the unit was returned to you on June 25th, 2015, have you presented this [RV] to the factory or an authorized repair center to have any additional repairs effectuated?

> A.: No.
>
> . . .
>
> Q.: Have you used the unit since it was returned to you on June 25th of 2015?
>
> . . .
>
> A.: I was hopeful to use it close to home. But when I refilled the water tank, shortly after that I recognized that the cabinets were pulling apart.
>
> . . .
>
> Q.: So as to that July 18, 2016 entry, is that about the time that you identified the problem with the cabinets pulling apart and the level issue on the back of the unit?
>
> A.: Yeah. . . .

Depo. of R. Mathews, pp. 94, 97. Mr. Mathews was asked again whether these alleged problems were ever reported to REV or whether REV was given an opportunity to address them:

> Q.: The issue with the separation of the island cabinet, has that ever been presented to the factory or an authorized dealer?
>
> A.: Only through this [lawsuit].
>
> Q.: Because it wasn't even discovered until July–
>
> A.: That's right.
>
> Q.: –of 2016?
>
> A.: That's right.
>
> . . .
>
> Q.: The fresh water tank failure, is that an issue that has been presented to [REV] or an authorized dealer for repair?
>
> A.: Only through this litigation.

*Id*., pp. 107, 110. Mr. Mathews also conceded that the alleged issue with the bedroom slide out

cable (as distinct from the curbside slide out cable[8]) was not presented to REV or an authorized

dealer for repair. *Id*., p. 108.

The record does not reflect any communication between the Mathews and REV after the

vehicle was returned from the factory on June 25, 2015, until their attorney sent a letter of

representation and demand to REV on July 13, 2015. Plaintiffs' Exh. 9 (ECF 30-9). This lawsuit

was filed about six weeks later.

Turning the focus to the Mathews' claim for breach of the implied warranty of

merchantability, they argue that it was breached on the basis that it was "unconscionable," and it

was unconscionable, they say, because they were not provided a copy of it until May of 2015

(and so were blind-sided by any limitations or restrictions included in it).[9] Their Amended

_____

[8] Regarding the issue of the *curbside* slide out cable, REV makes the following important
point:

> Plaintiffs argument in support of a breach of warranty has confused the issues
> regarding the curbside slide and the bedroom slide, two distinct issues. Plaintiffs
> concede that the bedroom slide is the only outstanding issue. . . . Yet, in support
> of their breach of warranty claims, Plaintiffs argue that the repairs to the curbside
> slide constitute an unreasonable number of repair attempts, and thus breach of the
> warranty. A repaired defect cannot constitute a breach of warranty. . . . REV's first
> repair to the curbside slide was done at the December 2014 factory visit, at which
> time the slide mechanism, *not the slide cable* was presented for repair. . . . The
> second repair to the slide was done on the *actual cable* at the May 2015 visit. . . .
> A broken curbside slide was never presented to REV again.

Defendant's Reply, p. 6 (internal citations to deposition pages and exhibits omitted). This
distinction is relevant to the issue of whether REV had a reasonable number of opportunities to
correct alleged problems with the RV (and its related issue: whether the Mathews failed to even
present certain alleged problems to REV in the first place). This issue of reasonableness is
discussed at length below.

[9] The Court notes that by taking the RV to Johnson's, the Mathews effectively, albeit
unwittingly, obtained the intended benefit of the "Back Up Remedy." Put another way, the
purpose of the Back Up Remedy was in essence effectuated when the Mathews had work done at
Johnson's at no charge. So while the Mathews repeatedly refer to this warranty requirement as a

Complaint doesn't include much in the way of specifics to support this argument. For example, the Amended Complaint states as follows:

> Through its advertising and otherwise, defendant represented that the recreational vehicles which it manufactured were of merchantable quality, fit and in proper condition for the ordinary use for which such vehicles are designed and used, and the Mathews Family relied on such, but the vehicle involved in this case was not, however, of merchantable quality and that was unfair and/or deceptive and/or unconscionable to the Mathews Family.

Amended Complaint (ECF 21), p. 11. This broad (not to mention conclusory) language appears repeatedly throughout the Amended Complaint, sans factual details. Nonetheless, the Mathews argue that their claim for breach of implied warranty of merchantability should survive summary judgment. The Mathews concede that the Limited Warranty offered by REV expressly limited the duration of any implied warranties and contained clear and unmistakable language to that effect, as required under Indiana law. Plaintiffs' Response, p. 30. However, the Mathews argue that such a limitation of an implied warranty is enforceable only "if the limitation is conscionable[.]" *Id*. The Mathews contend that "[h]ere, [REVs] attempt to limit the duration of its implied warranty of merchantability is ineffective because it is unconscionable[]" because REV "failed to make the warranty available to Plaintiffs at the time that the sale contract was signed." *Id*., p. 31. None of these contentions, however, render the Limited Warranty unconscionable. The Mathews arguments, as REV points out, have been rejected by several courts. REV argues as follows:

> [D]evoid of any legal support (perhaps because there is none), plaintiffs maintain

---

"secret Back Up Remedy" since they were not given a physical copy of it before they took their RV to Johnson's (*see* Plaintiffs' Response, pp. 25-27), the essential purpose of it as far as the purchasers are concerned–allowing them to take their RV to a local mechanic for servicing at no charge–was achieved. Of course, this does not change the undisputed facts that REV had no knowledge of the RV being taken to Johnson's and Johnson's was never authorized to perform those repairs.

because they were not provided with the Limited Warranty until after the purchase of the RV and because they were not aware of the terms, then there was no meeting of the minds. This argument has been rejected by this court, and several others. *See, S & O Liquidating P'ship v. C.I.R.*, 291 F.3d 454, 459 (7th Cir. 2002); *Hughes Masonry Co. v. Greater Clark Cnty. Sch. Bldg. Corp.*, 659 F.2d 836, 839 (7th Cir. 1981) ("In short, (plaintiff) cannot have it both ways. (It) cannot rely on the contract when it works to its advantage, and repudiate it when it works to (its) disadvantage." (citations and quotations omitted)). In *Dixon* [*v. Monaco Coach Corp*., 2009 U.S. Dist. LEXIS 5737 (N.D. Ind. 2009)][10] the Dixons argued they were not given an opportunity to bargain the terms of the Limited Warranty provided with an RV, because they did not receive it until 7 months after they purchased the RV. *Dixon,* 2009 U.S. Dist. LEXIS 5737 at *7. Plaintiffs thus concluded they could not be bound to the terms of the warranty. *Id.* The court rejected Plaintiffs arguments and noted:

> While lamentable, this Court does not find the stated deficiencies with the delivery of the warranty's terms sufficient to prevent the application of the statute of limitations stated therein. To begin, the Dixons failed to present any authority to show that a failure of delivery is sufficient, in itself, to negate the express terms of a limited warranty. Instead, even assuming that the Dixons' representations are accurate and they did not actually receive the warranty's terms until seven months after they purchased the RV at issue, the Dixons were clearly on notice from that point forward of the warranty's terms.

*Id.* The court further asserted:

> It is undisputed the Dixons took advantage of the warranty prior to filing their claim, requesting and receiving numerous repairs from Monaco during the applicable warranty period. As such, the Dixons can not now argue that they are suddenly surprised by the application of the Limited Warranty and its terms relating to the filing of breach of warranty claims.

*Id. at 8.*

Just like the Dixons, Plaintiffs state they were not provided a copy of the Limited Warranty at the time of purchase. In an uncanny parallel, Plaintiffs have also failed to provide any authority to support the argument that a failure of delivery is sufficient to allow the court to ignore the terms of the warranty. Plaintiffs have tried to paint a picture that the Limited Warranty was somehow hidden from them, but the facts do not support that picture. Plaintiffs have not alleged they were ever

---

[10] 2009 WL 187837 (N.D.Ind. Jan. 27, 2009).

denied a copy of the warranty after requesting it, or that prior to purchasing the RV they were explicitly refused an opportunity to review the warranty. . . . They also do not allege they ever notified REV that they had not received a copy of the warranty. [*Id.*]. Plaintiffs were clearly on notice of the existence of the Limited Warranty, having been told when [they] purchased the RV that there was a warranty. . . . Plaintiffs also took full advantage of the Limited Warranty on two separate occasions.

Defendant's Reply, pp. 9-11 (internal citations to Defendant's exhibits omitted). The *Dixon* case is remarkably similar to the present one, as the Mathews contend that they did not receive a copy of the Limited Warranty for a year after their purchase but admit in their testimony that they took advantage of the Limited Warranty on two occasions (although they, like the Dixons, argue that they were not completely satisfied with the repairs).

Another district court, addressing the same issue in a similar factual context, held as follows:

Here, Plaintiffs allege in their response to the motion for summary judgment that they were unaware of the warranty's limitation clause at the time of purchase[.] . . . Even assuming that Plaintiffs were unaware of the limitation provision, they do not allege that they were unaware of the written warranty at the time they purchased the motorhome. Moreover, they sought to take advantage of the benefits of the written warranty by having their motorhome repaired (though, of course, they allege the repair efforts were not entirely successful). *See Merricks* [*v. Monaco Coach Corp.*], 2008 WL 5210856, at *5 [W.D. Va. Dec. 15, 2008] (noting that plaintiffs had "taken advantage of the beneficial portions of the warranty, receiving free repairs and service under it"–even though the plaintiffs alleged that the numerous repair attempts were unsuccessful–and thus had to "accept the less advantageous portions of the warranty, such as a reduced statute of limitations").

*Dytko v. Forest River, Inc.*, 2017 WL 5611613, at *6 (D.N.M. Nov. 20, 2017). For these reasons, the Mathews' argument that the limitations contained in the Limited Warranty were unconscionable because they had not been given a copy of it at the time of purchase is unsupported by both the facts and the law.

But once again, the determinative issue is not whether the Mathews were aware of any warranty limitations but rather, whether the warranty coverage *was breached*. It is undisputed that the Mathews never contacted REV or any other dealer or servicer seeking to enforce the warranty and obtain repairs to any issues after they received the RV back from the factory on June 25, 2015. REV had no notice nor any opportunity to repair or cure the issues the Mathews allege arose since that date. On the two occasions when the Mathews did contact REV and voice complaints, the vehicle was taken into the factory to address and repair all the problems the Mathews presented, in keeping with the terms of the warranty.

Finally, the Mathews argue that the Limited Warranty was breached because it "failed of its essential purpose." Plaintiffs' Response, p. 26. They state that "[a]n exclusive remedy . . . has failed of its essential purpose where attempted repairs fail to correct the problem." *Id*. (citing *Swan Lake*, 2010 LEXIS 103405, *18. That is a correct statement of law but not a valid argument, since it assumes that REV had a reasonable number of opportunities to repair problems presented to it and failed to do so–a conclusion that the undisputed facts do not support, as the Court has explained. Accordingly, the Mathews' argument that the Limited Warranty was breached because it failed of its essential purpose is unavailing.

### III. The Mathews' allegations of violations of state law deceptive practices statutes are unsupported by the undisputed facts and the applicable law.

The Mathews' ambiguously pleaded claim for violation of some unspecified deceptive practices statute also fails. The Mathews argue in their brief that REV committed a deceptive act under Virginia and Pennsylvania law. Plaintiffs' Response, p. 38-42. They present no discussion or argument that REV violated a comparable Indiana statute, even though their Amended

Complaint states that they are asserting claims under "the Pennsylvania and/or Virginia and/or Indiana "Udap" laws, i.e., state-enacted Unfair and Deceptive Acts statutes." Amended Complaint, p. 2. Later in their Amended Complaint the Mathews allege the following:

> This claim is for violation of applicable state Udap laws, being the Pennsylvania Unfair Trade Practices and Consumer Protection Law, and/or the Virginia Consumer Protection Act, and/or the Indiana Deceptive Consumer Sales Act, by defendant.
> . . .
>
> [REV] committed one or more unfair and/or deceptive and/or unconscionable acts or practices in violation of the Indiana Udap law, before, during or after a consumer transaction between the Mathews Family and a supplier in relation to the 2014 Holiday Rambler Presidential [RV].

*Id*., p. 14, ¶ 49; p. 16, ¶ 52. So, the Mathews' Amended Complaint references statutes from Virginia, Pennsylvania and Indiana, but the allegations in the Complaint refer only to a violation of some unspecified "Indiana Udap law." In their brief, however, the Mathews abandon the allegations in the Amended Complaint and argue that REV violated consumer protection statutes of Virginia "and/or" Pennsylvania. Plaintiffs' Response, pp. 38-42. Their response brief, though, presents no discussion or argument about–nor does it even reference–any Indiana statute ("Udap" or otherwise).  But since this Court is applying Indiana law to this claim for the reasons already discussed above, the Court will infer, again in deference to the Mathews as the nonmovants, that they intended to plead a claim under the Indiana Deceptive Consumer Sales Act. As this Court has explained previously:

> Indiana's Deceptive Consumer Sales Act (IDCSA), Ind. Code § 24-5-0.5-1 *et seq*., is a remedial statute that must be "'liberally construed and applied to promote its purposes and policies' of protecting consumers from deceptive or unconscionable sales practices." *Kesling v. Hubler Nissan*, 997 N.E.2d 327, 332 (Ind. 2013) (quoting § 24-5-0.5-1). Pursuant to the IDCSA, a supplier commits a deceptive act when it makes certain representations "as to the subject matter of a consumer

transaction, which can be made orally, in writing, or by electronic communication." § 24-5-0.5-3(b).

Such representations include, in relevant part:

(1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have;

(2) That such subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not;
. . .

(8) That such consumer transaction involves or does not involve a warranty, a disclaimer of warranties, or other rights, remedies, or obligations, if the representation is false and if the supplier knows or should reasonably know that the representation is false.

*Id*. A deceptive act is only actionable if it is either "uncured" or "incurable." *Perry v. Gulf Stream Coach, Inc.,* 814 N.E.2d 634, 647 (Ind.Ct.App. 2004). An "uncured deceptive act" is defined as a deceptive act "with respect to which a consumer who has been damaged by such act has given notice to the supplier. . . but the supplier either fails to offer to cure within thirty days or does offer to cure but fails to cure within a reasonable time after the consumer accepts the offer." *Id*. (citing Ind. Code § 24-5-0.5-2) (internal quotation marks omitted); *see also id*. (noting that an intent to defraud or mislead is not an element to an uncured deceptive act). An "incurable defective act," on the other hand, is defined as an act "done by a supplier as part of a scheme, artifice, or device with intent to defraud or mislead." Ind. Code § 24-5-0.5-2(a)(8).

*Popham v. Keystone RV Co.*, 2016 WL 4993393, at *9 (N.D. Ind. Sept. 19, 2016) (italics added).

In this case, the Mathews claim that REV had sufficient opportunities to cure any defects (counting the repairs done by Johnson's, of course) but failed to do so. To proceed on a claim under the IDCSA then, they must establish that REV "fail[ed] to cure within a reasonable time" or after a reasonable number of opportunities. But the Court has already determined that the undisputed facts do not support that allegation, and in fact prove otherwise. The Mathews'

34

allegation that REV committed a deceptive act by "fail[ing] to repair the RV's defects in a reasonable amount of time or a reasonable number of repair attempts" is belied by the undisputed facts and unsupported by case law. Even assuming, again out of deference to the nonmovants, that the two repair visits to Johnson's, which REV knew nothing about, should be imputed to REV–the law does not support the Mathews' argument that that in turn constitutes a breach of REV's duty to repair within a reasonable time or after a reasonable number of attempts. The Mathews, citing to this Court's decision in *Cimino v. Fleetwood Enterprises*, acknowledge the elements of a claim for breach of express warranty. Plaintiffs' Response, p. 35. In *Cimino*, Judge Springmann explained as follows:

> In order to prevail on a claim [for breach of warranty], the Plaintiffs have the burden of establishing, by a preponderance of the evidence, five elements: (1) the Plaintiffs complied with the terms of the warranty; (2) the motor home contained a defect covered by the warranty; (3) the Defendants were given a reasonable opportunity to perform the necessary repairs; (4) *the Defendants were unable to repair the defect within a reasonable time or after a reasonable number of attempts*; and (5) the Plaintiffs have suffered damage.

*Cimino v. Fleetwood Enterprises, Inc.*, 542 F.Supp.2d 869, 882 (N.D. Ind. 2008) (italics added) (citations in accompanying footnote omitted). The Mathews contend that REV had sufficient opportunities and sufficient time to repair problems with the RV and failed to do so–an argument the Court has already determined is unsupportable in light of the undisputed facts showing that the Mathews sought *and obtained* repairs to the RV under the terms of the Limited Warranty on only two occasions, and that many alleged issues were never presented at all. REV, also citing this Court's decision in *Cimino*, notes that "[t]he standard for reasonableness is not measured by time alone, but is measured by a reasonable amount of time *or* reasonable number of attempts." Defendant's Reply, p. 4 (emphasis in original). REV cites a number of cases on this point. *Id*.

(citing *Marchionna v. Ford Motor Co.*, 1995 U.S. Dist. LEXIS 11408 *11 (N.D. Ill. 1995);

*Malkamaki v. Sea Ray Boats,* 2005 U.S. Dist. LEXIS 33807 *9 (N.D. Ohio 2005); *Portillo v.

Georgie Boy Mfg.*, 2005 U.S. Dist. LEXIS 25071, *4 (N.D. Ill. 2005) (holding six times is

reasonable opportunity for repair); *Cimino*, 542 F.Supp.2d 869, n. 4 (citing *Evans v. GMC*, 459

F.Supp.2d 407 (D.Md. 2006) (establishing 4 opportunities is a reasonable number of attempts to

cure)).

     In *Anderson v. GulfStream Coach*, the Seventh Circuit addressed this reasonableness

standard and concluded that the defendant in that case did have reasonable opportunities and a

reasonable amount of time to perform repairs, but failed to do so:

> [V]iewed in the light most favorable to the Andersons, the record supports their
> claim that Gulf Stream was given a reasonable opportunity to cure. The
> Andersons took the Tourmaster back to Royal Gorge for repairs many times from
> September 2008 to January 2009. Numerous warranty claims were sent to Gulf
> Stream over that time period describing the problems with the Tourmaster.
> . . .
> It was not until March 27, 2009, that Gulf Stream sent a letter to the Andersons
> offering to extend its warranty and to take the Tourmaster back to its factory in
> Indiana for repairs. At that point, nearly two months had passed since Gulf Stream
> had offered but failed to send parts to Royal Gorge. Gulf Stream could have cured
> by honoring its commitment to work with Apple to repair the Tourmaster. It did
> not. . . . *The Andersons gave Gulf Stream plenty of time to fix the problems* with
> the Tourmaster.

*Anderson v. Gulf Stream Coach, Inc.*, 662 F.3d 775, 783 (7th Cir. 2011) (italics added). The

circumstances in the present case, however, are markedly different in that REV had only two

opportunities to perform repairs before the Mathews yelled breach, and even then many of the

Mathews' complaints, by their own admission, were never communicated to REV.

     The varied conclusions in these cases as to what constitutes reasonableness reflect the

fact-specific nature of breach of warranty claims, which is exactly why Indiana law provides that

"'[t]he standard to be applied in determining whether or not there has been a breach of warranty is one of reasonableness *in light of surrounding circumstances*.'" *Swan Lake*, 2010 WL 3894576, at *3 (quoting *Barnes v. MacBrown and Company, Inc.*, 342 N.E.2d 619, 621 (Ind. 1976)); *see also*, *Peltz Const. Co. v. Dunham,* 436 N.E.2d 892, 895 (Ind.Ct.App. 1982); *Deckard v. Ratcliff*, 553 N.E.2d 523, 525 (Ind.Ct.App. 1990).[11]

The Mathews' also argue that REV violated the IDCSA (or Virginia or Pennsylvania statutes, but those are not at issue for the reasons already discussed) because it "unconscionably limited the duration of its Limited Warranty" and such an unconscionable act in turn supports an IDCSA claim. Plaintiffs' Response, p. 30. REV contends that the Mathews' position is belied by the undisputed fact that the Mathews "acknowledge they were aware a warranty existed and took full advantage of it. . . . Accordingly, they must accept its burdens. . . . Plaintiffs do not allege that they were denied a copy of the warranty or [that] they ever requested copies and were refused. . . . The evidence shows that Plaintiffs first informed REV in May 2015 that they did not have a copy of the warranty. . . . Upon learning this REV promptly provided one. Prior to this, REV had [no] way of knowing that the dealership had not included a copy." Defendant's Reply, p. 21.

In Indiana, "[u]nconscionability is a question of law" for a court and "[t]he party raising

_____

[11] This standard is the same in Virginia (*see, e.g., Ferguson v. Upper Chesapeake Med. Servs., Inc*., 91 F.3d 130 (4th Cir. 1996) (discussing cases holding that whether breach of warranty has occurred depends on surrounding circumstances)) and Pennsylvania (*see e.g., Samuel-Bassett v. Kia Motors Am., Inc*., 34 A.3d 1, 18 (Pa. 2011) ("buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy") (quoting 13 Pa.C.S. § 2607(c)(1))*.*

the issue bears the burden of proof." *Martin Rispens & Sons v. Hall Farms*, 621 N.E.2d 1078,

1086 (Ind.Ct.App. 1993), abrogated on other grounds by *Hyundai Motor Am., Inc. v. Goodin*,

822 N.E.2d 947 (Ind. 2005).

> As this Court explained in *Popham v. Keystone RV*:

> A one-year durational warranty is not per se unconscionable. "The possibility that a latent defect may exist is one of the risks present at the time the contract is formed," *Martin Rispens*, 621 N.E.2d at 1086, and does not, in and of itself, render a contract unconscionable. In fact, most consumers encounter time limitations in warranties for newly purchased products, oftentimes for one-year or less, and still take such a risk by going through with the purchase. *See, e.g., Nation Enter., Inc. v. Enersyst, Inc.*, 749 F.Supp. 1506, 1508 (N.D. Ill. 1990) (pizza oven with one-year warranty); *Rutledge v. Hewlett-Packard Co.*, 190 Cal.Rptr.3d 411, 418 (Ct.App. 2015) (laptop with one-year warranty); *Nulite Indus. Co. v. Horne*, 556 S.E.2d 255, 256 (Ga.Ct.App. 2001) (vinyl siding and windows with one-year warranty). The Plaintiff has put forward no evidence showing that the Limited Warranty was oppressive as applied to the Plaintiff–all the evidence shows that the Defendant timely remedied RV issues during the Limited Warranty period, which is by no means unconscionable. *See Jones v. Fleetwood Motor Homes*, 127 F.Supp.2d 958, 966 (N.D. Ill. 2000) (reasoning similarly).

*Popham v. Keystone RV Co.*, 2016 WL 4993393, at *6-7 (N.D. Ind. Sept. 19, 2016); *see also*,

*Hahn v. Ford Motor Co.*, 434 N.E.2d 943, 952 (Ind.Ct.App. 1982) ("Modification of warranties

and limitations of remedy are not per se unconscionable."). REV is correct when it argues that

the Mathews were aware of the Limited Warranty and its terms, and even took advantage of it by

having repair work done at REV's factory on two (and only two) occasions, so they cannot claim

now that any of its terms or limitations are unconscionable based on the fact that they did not

receive physical copy of it at the time of sale.

Finally, the Mathews, double down on their unconscionability argument by adorning it

with additional assertions. Plaintiffs' Response, p. 40. They claim that REV committed several

unconscionable acts, in addition to not providing them with a copy of the warranty, and that any one of these acts could in turn constitute a deceptive act giving rise to their IDCSA claim. The Mathews state as follows:

> Here, reasonable minds could conclude that Defendant committed one or more unfair or deceptive acts in connection with a consumer transaction when it did the following acts . . . : (1) attempted to unconscionably limit its express warranty, (2) failed to make a copy of its express warranty available to Plaintiffs prior to their purchase of the RV, (3) failed to provide Plaintiffs with a local authorized dealer, (4) delivered an RV to Plaintiffs that contained a latent defect in the fresh water tank support system, (5) delivered an RV to Plaintiffs that was and is now and was [sic] uninhabitable at the time of delivery because the improper slide out fit and failing slide out seals do not allow the A/C (or the heater) to reach or sustain comfortable temperatures, (6) failed to repair the RV's defects in a reasonable amount of time or a reasonable number of repair attempts, and/or (7) failed to deliver to Plaintiffs an RV that was fit for its ordinary use.

Plaintiffs' Response, pp. 41-42.

That is quite a laundry list of alleged deceptive acts and also a problematic one. As REV points out, the Mathews' "Amended Complaint is devoid of any mention of the last six allegations. The first allegation was stated in the Complaint, but as argued above, Plaintiffs have failed to establish that the duration of the Limited Warranty is unconscionable. . . . Allowing Plaintiffs to amend their Complaint this late in the game is improper and the court should deny the consideration [sic] of these allegations in [its] ruling on Summary Judgment." Defendant's Reply, p. 20. The language in the Amended Complaint controls since, as REV points out, "'[a] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.'" Defendant's Reply, p. 19 (quoting *Shanahan v. City of Chicago*, 82 F.3d 776 (7th Cir. 1996)). REV states that "[a] party is attempting to amend their complaint if they are seeking to change the factual theory which their claim is based upon and the court may

deny consideration of the new factual claims." *Id.*, pp. 19-20 (citing *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 860 (7th Cir. 2017)). That is a correct statement of a well-established point of law. *See Trusley v. JPMorgan Chase Bank, N.A.*, 2017 WL 2655616, at *3 (S.D. Ind. June 19, 2017) (a plaintiff "may not amend his Complaint through statements in his response brief[]") (citing *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012)). Moreover, argues REV, "even if the court were to consider all seven allegations against REV, Plaintiffs' claims cannot succeed. . . . Neither Indiana, Virginia, or Pennsylvania [statutes] provide that the alleged actions constitute a deceptive act under the statute." *Id.*

REV's argument is well taken. The Mathews cannot avoid summary judgment by presenting new theories of recovery to oppose it. But even if these new arguments are proper they still fail to support a claim for a deceptive or fraudulent act. The first three allegations on their list have already been addressed and determined to be unfounded. The fourth and fifth allegations refer to alleged problems that were either addressed by REV or never presented for repair. The six allegation–that REV had reasonable opportunity to make repairs but failed to do so–has also been rejected. And the seventh allegation is not an allegation at all, but a factual and legal conclusion that serves only to restate the Mathews' argument that the RV was not merchantable. For these reasons the Mathews' arguments that REV committed a deceptive act are insufficient to withstand the motion for summary judgment.

This case is a cluttered mess of immaterial factual disputes, unsupportable claims and maze-like presentation of arguments. But a 30,000-foot view of it, with the undisputed material facts in focus, reveals the fatal flaws in the Mathews' Amended Complaint. The Mathews' factual recitation paints a vivid picture of the many problems they had with the RV and their

efforts to get those problems repaired. But undisputed material facts prove REV's contention that

it did not breach any warranty, and so all of the Mathews' claims fail as a matter of law. The

problems with the RV so frustrated the Mathews that they tried to return it and get their money

back, but REV refused. That was the fuse that lit the Mathew's ire and compelled them to file

this lawsuit. As the Mathews state it:

> The RV's continuing defects, problems, and malfunctions became a never-ending
> story the Mathews Family didn't want to hear or experience, and most certainly
> not what they thought they were getting when they first looked at the Holiday
> Rambler Presidential RV as it sat new on the dealer's lot before they bought it. At
> the end of it all, their patience exhausted, they asked the factory to take it back and
> give them back their money. The answer they got is the reason this lawsuit was
> filed.

Amended Complaint, p. 5, ¶ 15. This paragraph is as telling as it is problematic. It is problematic

because it is a subjective statement of the Mathews' (largely understandable) level of frustration

rather than a factual assertion and so has no relevance to any issue. It is telling because it reveals

the fatal flaw in their case: their frustration boiled over and took the form of this lawsuit, but the

undisputed material facts–revealed in the Plaintiffs' own testimony–do not provide a legal basis

for it.

    The Mathews' claims all stem from their premise that REV "was not able to repair [the

RV] within a reasonable number of chances or a reasonable amount of time" and so REV

breached its "express and/or implied warranties[.]" Amended Complaint, p. 3. They allege that

REV or its agent (i.e., Johnson's) "tried fixing the RV's many defects repeatedly" after they

"notified both the dealer and the defendant of this and many more defects in the RV." Amended

Complaint, pp. 6-7. But for the reasons discussed at great length above, these statements are not

accurate factual assertions; they are instead conclusory statements that are contradicted by the

41

undisputed material facts.

The Mathews pulled out all the stops in their effort to convince the Court that genuine issues exist that preclude summary judgment. REV refers to the Mathews' arguments as a "throw everything against the wall and hope something sticks approach[,]" which is an accurate characterization. The Mathews raise and argue about many factual disputes but they tiptoe away from the determinative ones, and the "mere existence of some alleged factual dispute between the parties" will not defeat a motion for summary judgment, nor will the existence of "some metaphysical doubt as to the material facts." *Michas v. Health Cost Controls*, 209 F.3d at 692 (quoting *Anderson v. Liberty Lobby*, 477 U.S. at 247; *Matsushita Elec.*, 475 U.S. at 586). It is equally well established that "speculation and conjecture" also cannot defeat a motion of summary judgment, *see Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013), and the Mathews' arguments in opposition to summary judgment rely heavily on both. There is a big difference between raising confusion about facts and actually demonstrating that genuine issues exist that require a trial. In this case, the Mathews have done the former but failed to accomplish the latter.

### IV. The Mathews' claim under the Magnuson-Moss Warranty Act fails because their underlying state law breach of warranty claim is not viable.

Finally, REV argues that the Mathews cannot maintain their claim under the Magnuson-Moss Warranty Act because the Act "'does not provide an independent basis for liability; it only provides for federal jurisdiction for state claims.'" Defendant's Memorandum, p. 20 (quoting *Priebe v. Autobarn, Ltd*., 240 F.3d 584, 587 (7th Cir. 2001)). REV argues that since the Mathews' state law breach of warranty claims fail, they cannot take advantage of the MMWA. *Id*. In *Priebe*, the Seventh Circuit did indeed hold that "[t]he portion of the [Magnuson-Moss]

Act under which Priebe sues *does not provide an independent basis for liability; it only provides for federal jurisdiction for some state claims*, including this breach of contract claim." . . . Because Priebe's underlying breach of contract claim fails, his Magnuson-Moss Act claim cannot succeed." *Priebe*, 240 F.3d at 587 (italics added). Even the Mathews note in their brief that the MMWA expressly "defines 'implied warranty' as 'an implied warranty *arising under state law*[.]'" Plaintiffs' Response, p. 35 (quoting 15 U.S.C. § 2301(7)); s*ee also*, *Schiesser v. Ford Motor Co.*, 2016 WL 6395457, at *4 (N.D. Ill. Oct. 28, 2016) ("The Magnuson-Moss Warranty Act creates a federal cause of action for breach of written and implied warranties under state law. See 15 U.S.C. § 2310(d)(1). The ability to sustain a cause of action under the Magnuson-Moss Act is dependent on the existence of an underlying viable state-law warranty claim." *Schiesser*, 2016 WL 6395457, at *4 (citing *In re Gen. Motors Corp. Dex-Cool Products Liab. Litig.*, 241 F.R.D. 305, 315 (S.D. Ill. 2007) ("Although Plaintiffs bring this action pursuant not to state law but the Magnuson-Moss Act, state law nonetheless dominates this case due to the peculiar nature of the federal statute, which in numerous respects is essentially a vehicle for vindicating state-law warranty claims in federal court."). The Mathews cannot proceed with their MMWA claim because their state law claim for breach of implied warranty–i.e., the "borrow[ed] state law cause[] of action" on which it is founded–is itself not viable. Stated most simply, where there is no breach there is no cause of action under either state or federal law. REV is entitled to summary judgment on the Mathews' claim under the Magnuson-Moss Warranty Act.

### V. Defendant's motion to strike Plaintiff's expert evidence.

REV moved to strike the testimony of Tom Bailey, the Mathews' proposed expert who inspected the RV and prepared an report itemizing alleged defects with the RV and how much it

would cost to repair them. Mr. Bailey's testimony and report go to the issue of damages, which the Court need not reach. Accordingly, REV's motion is denied as moot.

**VI. Plaintiffs' motion to amend their response nunc pro tunc.**

The Mathews filed this motion seeking "to replace the heading on page 1 of Plaintiffs' brief in opposition to Defendant's motion for summary judgment which currently reads "Statement of Facts" with the correct heading "Statement of Genuine Disputes." Motion for Leave to Amend Plaintiffs' Brief, p. 1. The Mathews filed this motion in response to REV's argument in its reply brief that the Mathews did not comply with this Court's local rules because they failed to "specifically 'include a section labeled 'Statement of Genuine Disputes' that identifies the material facts that the party contends are genuinely disputed so as to make a trial necessary.'" Defendant's Reply, p. 2, n.1 (quoting N.D.Ind. L.R. 56.1(b)(2). REV argues that the Mathews "did not comply with the rules and, therefore, has not properly disputed any of the facts identified by REV in its Statement of Material Facts. The Court should take the facts in REV's Statement of Material Facts as admitted." *Id*. (citing L.R. 56.1; *Rangel v. Schmidt*, 2011 LEXIS 132481, at *15-17 (N.D. Ind. 2011)).

The Mathews filed their motion to amend "seek[ing] leave to amend their brief *nunc pro tunc* out of [an] abundance of caution and in strict compliance with [local rules]. [REV] will not be prejudiced by the amendment, because Plaintiffs merely seek to amend only the heading of the disputed facts section of the brief and not to amend the substantive disputed facts themselves[.]" Plaintiffs' Motion to Amend, p. 2. The Plaintiffs maintain that "it is clear from Plaintiffs' motion that the heading for the disputed facts section was simply a drafting error[.]" Plaintiffs' Reply in Support of Motion to Amend (ECF 43), p. 2.

REV is correct that the Mathews' brief is not in strict compliance with the local rules for this district, but the issue is obviously moot given the Court's ruling on the motion for summary judgment. The incorrect heading in the Plaintiffs' brief was a mistake and a bit of a sloppy one, but in the end it did not affect anything or have any impact on the Court's analysis, reasoning or conclusions. The issues before the Court were not confused by the fact that the Mathews' brief contained a incorrect heading. As the Mathews put it, "the error does not impact the merits of the brief itself or the many facts in dispute as seen from the Plaintiffs' brief." Plaintiffs' Reply in Support of Motion to Amend, p. 2. The Mathews contend, and they are correct, that "Plaintiffs' Brief in opposition repeatedly states that the material facts are in dispute, and those disputed facts are outlined in detail within the Brief." *Id*. In sum, the issues presented by the motion for summary judgment, and the Mathews' arguments in opposition, are set out in great detail in their briefs (as they should be, given that the parties needed extra time and extra pages to explain their positions). The Court carefully reviewed the parties' pleadings and evidence, and their substantive arguments are clear. The Mathews' error in their brief was of no moment. The resolution of REV's motion for summary judgment turns wholly on the *undisputed* material facts, and thus the error in the Mathews' brief does nothing to change the calculus. And obviously, given the Court's conclusions, REV was not prejudiced by it. The Mathews' motion is therefore moot.

## CONCLUSION

For the reasons discussed above, REV's motion for summary judgment (ECF 29) is GRANTED; REV's motion to strike expert opinion (ECF 28) is DENIED AS MOOT; and the Mathews' motion to amend their brief in opposition is DENIED AS MOOT.

Date: April 2, 2018.

/s/   William C. Lee
William C. Lee, Judge
U.S. District Court
Northern District of Indiana